IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TERESA GIBBONS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:12-CV-0427-BH |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are *Plaintiff's Motion for Summary Judgment*, filed June 7, 2012 (doc. 14), and *Defendant's Motion for Summary Judgment*, filed August, 22, 2012 (doc. 20).  Based on the relevant filings, evidence, and applicable law, Plaintiff's motion is **GRANTED in part**, Defendant's motion is **DENIED in part**, and the case is **REMANDED** to the Commissioner for further proceedings.

## I. BACKGROUND[1]

### A.    Procedural History

Teresa Gibbons (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claims for disability insurance benefits and supplemental security income (SSI) under Titles II and XVI of the Social Security Act. (R. at 5–7.) Plaintiff applied for disability insurance benefits and SSI in January 2009, alleging disability

---

[1]    The background information comes from the transcript of the administrative proceedings, which is designated as "R."

beginning December 26, 2008, due to lupus, Sjrögen's disease, arthritis in her spine/back, and carpal tunnel syndrome. (R. at 176, 184.) Her claims were denied initially and upon reconsideration. (R. at 78–85, 88–93.) She timely requested a hearing before an Administrative Law Judge (ALJ). (R. at 94–95.) She personally appeared and testified at a hearing on July 30, 2009. (R. at 45–57.) On August 25, 2010, the ALJ issued his decision finding Plaintiff not disabled. (R. at 24–39.) The Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 5–7, 18–20.) She timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g). (doc. 14.)

**B.**   **Factual History**

**1.**   **Age, Education, and Work Experience**

Plaintiff was born on May 24, 1965; she was 44 years old at the time of the hearing. (R. at 48, 64.) She graduated high school and has past relevant work as an assistant store manager, a retail sales person, and a fast food worker. (R. at 60.)

**2.**   **Medical, Psychological, and Psychiatric Evidence**

The record reveals that Plaintiff visited a medical provider on June 3, 2005, to refill her "Paxil" prescription for her depression. (R. at 404.) During the consultation, she complained of "tiredness" and "weight-gain," but denied any fever or cough. (*Id.*)

On July 21, 2005, Plaintiff presented to Jense Benjamin, M.D., her primary care physician, complaining of back and neck pain that had been ongoing for two weeks. (R. at 401.) Dr. Benjamin diagnosed her with streptococcal sore throat, migraines, and arthralgias[2] in her neck and all the joints in her back. (*Id.*)

---

[2]   Arthralgia is an ache or "pain in a joint." *See* Medicine.Net.com http://www.medterms.com/script/main/art.asp?articlekey=2343 (last visited Mar. 28, 2013).

The following month, Plaintiff returned to Dr. Benjamin's office and reported having severe back pain for the past two months.  (R. at 400.)  She told Dr. Benjamin that she worked in retail, "fell flat on [her] back" three years earlier, and had suffered from back pain ever since.  (*Id.*)  She "denie[d] any tingling [or] numbness," but had "soreness in [her] upper thoracic and lumbar spine." (*Id.*)  She also reported a history of carpal tunnel syndrome that caused her "some numbness" in her right hand.  (*Id.*)  Dr. Benjamin found she had a decreased range of motion and a "sensory deficit" in her extremities.  (*Id.*)  She diagnosed her with throat pain and arthritis of the joints, the thoracic spine, and the lumbar spine at L5, and prescribed her Naproxen and Flexiril.  (*Id.*)

That same day, Plaintiff underwent X-rays of her thoracic and lumbar spine at Mesquite Community Hospital.  (R. at 397, 399.)  The images of her thoracic spine revealed "[n]o fracture or focal distortion of the paravertebral lines," the "[p]osterior elements [were] grossly normal," "[t]he kyphus [was] normal in degree," and there were "small spurs at vertebral body margins" and "an extremely subtle compound scoliosis convexed to the right superiorly and to the left inferiorly." (*Id.*)  The final impression was "trivial scoliosis."  (*Id.*)  The images of her lumbar spine revealed "normal alignment and no fracture or loss of disc height," "small spurs at L3 and L4 anteriorly," the "spinal canal [was] spacious," and the "posterior neural arch elements, facets, and sacroiliac joints [were] normal."  (R. at 399.)  The impression was "minimal spurs."  (*Id.*)

Dr. Benjamin referred Plaintiff to Kasturi Inaganti, M.D., a rheumatologist, because of "abnormal blood work, including a positive ANA of 327."  (R. at 421.)  Plaintiff saw Dr. Inaganti on August 29, 2005 for an initial consultation.  (R. at 420.)  She complained of back pain and headaches that began in 2004.  (*Id.*)  On a 10-point scale, she rated her pain at 5.  (*Id.*)  Dr. Inaganti wrote a letter to Dr. Benjamin on August 29, 2005, noting Plaintiff's complaint of pain in her neck,

and thoracic and lumbar spine "for the past year which ha[d] been progressively getting worse." (R. at 421.) Dr. Inaganti noted Plaintiff's statement that her pain radiated "into [her] bilateral lower extremities and usually to the level of the knees, ... sometimes on the right side, [and] occasionally into the right foot." (*Id.*) Plaintiff also had "some pain and heaviness with some numbness in the fingers of the right [hand] which ha[d] been ongoing for the past two years." (*Id.*) Dr. Inaganti also noted Plaintiff's allegation that she was "diagnosed with carpal tunnel syndrome on the right side by a specialist based on [an] EMG nerve conduction study and … her symptoms." (*Id.*) She "ha[d] stiffness early in the mornings in her lower back for about an hour," and her pain "seem[ed] to get worse by the end of the day." (*Id.*) She denied any tingling or numbness in her "bilateral lower extremities." (*Id.*)

During a physical examination, Dr. Inaganti found "no evidence of active synovitis." (R. at 422.) He noted "some tenderness on the right side with Phalen's test but no tingling or numbness [in] the fingers." (*Id.*) "There [was] no active synovitis in the hand joints or any other joints," Plaintiff's "[r]ange of motion of the neck appear[ed] intact," and "there [was] some tenderness at the level of L3 [and] L4 along her spine." (*Id.*) "There [was] no paraspinal muscle spasm," "[s]traight leg raises [were] negative bilaterally," and there was "no evidence of trochanteric bursitis." (*Id.*) Dr. Inaganti's impressions were "[p]ositive ANA with no clear cut ACR criteria for systemic lupus erythematosus," "upper and lower back pain," "possible lumbar radiculopathy, ... [and] possible cervical radiculopathy with radiating pain into [Plaintiff's] right hand." (*Id.*) He found that she "appear[ed] to have right carpal tunnel syndrome which could account for some tingling, numbness, and pain in her right hand." (*Id.*) He increased her Flexiril dosage and ordered an MRI of her cervical and lumbar spine "to evaluate for any radiculopathy or any other spinal

stenosis." (*Id.*)

Plaintiff followed-up with Dr. Inaganti two weeks later, and again complained of neck and lower back pain. (R. at 414.) She told him that the Flexiril gave her no relief from her symptoms. (*Id.*) Dr. Inaganti assessed degenerative disc disease, neck pain, cervical and lumbar radiculopathy, and spine tenderness. (R. at 414–22.)

On September 19, 2005, Plaintiff returned to Dr. Benjamin. (R. at 392.) Her chief complaint was "possible diabetes." (*Id.*) She also complained of mood swings and requested to check her blood sugar level. (*Id.*) Her past medical history was noted as "arthritis [and] depression." (*Id.*) Dr. Benjamin diagnosed her with "abnormal glucose" and "arthritis." (*Id.*) An ultrasound of her abdomen taken two days later was "unremarkable." (R. at 416.) Plaintiff saw Dr. Benjamin again on October 25, 2005, because she had a sore throat and cough. (R. at 391.) Dr. Benjamin diagnosed her with pharyngitis, laryngitis, and abdominal pain. (*Id.*) The following month, Plaintiff was experiencing pain in her ears, throat, and chest, anxiety, and eye dryness. (R. at 390.) Dr. Benjamin diagnosed her with bronchitis, fever, pharyngitis, and chest congestion. (*Id.*)

Plaintiff saw Dr. Benjamin to follow-up with her severe insomnia and depression on February 13, 2006. (R. at 387.) She was "unable to sleep, irritable, sad, and … crie[d] all the time." (*Id.*) Dr. Benjamin diagnosed her with depression, insomnia, and high blood pressure, and prescribed her Lunesta for her insomnia and Effexor for her depression. (*Id.*) A month later, Plaintiff reported she was "doing a lot better" but complained of "urinary frequency." (R. at 386.) Her sleep medication and anti-depressant were "working well." (*Id.*) She measured 64 inches and weighed 173 pounds. (*Id.*) Dr. Benjamin diagnosed her with urinary frequency, insomnia, and depression, and refilled her medications. (*Id.*)

On June 23, 2006, Yolanda G. Kraynick, Ph. D., a psychological consultant with disability determination services, interviewed Plaintiff, and completed a mental status examination. (R. at 423–25.) Dr. Kraynick noted that Plaintiff "drove herself to the appointment" and arrived "alone." (R. at 423.)  Plaintiff's chief complaints were depression, lupus, and Sjögren's disease.  (*Id.*) Plaintiff "reported that her back and legs [were] in constant pain," she "ha[d] a lot of headaches, and she [was] significantly limited in her activities due to her physical health status." (*Id.*)  Because of "her decline in physical health," she became more depressed, angry, and frustrated with herself, and she felt useless and like "a burden to others." (*Id.*)  Although "her symptoms ha[d] improved [with] [her] medications," "she still report[ed] [a] depressed mood, weight gain, … psychomotor agitation, daily fatigue, loss of energy, worthlessness, … guilt, and diminished concentration." (*Id.*)  "She denied manic symptoms, but [claimed] worrying about everything all the time." (*Id.*)  "[S]he experience[d] accelerated heart rate, trembling, and some nauseous feeling apart from the physical symptoms of her lupus and Sjögren's." (*Id.*)  Although she still "ha[d] problems going to sleep and staying asleep," her symptoms had improved "since she started on a sleep aid, Lunesta." (*Id.*)  She had no suicidal ideations.  (*Id.*)  She last worked in February 2006.  (*Id.*)

In her mental status examination, Dr. Kraynick found that Plaintiff "was neat, … casually dressed, … and well groomed." (*Id.*)  "She was open and cooperative, put forth good effort [in the interview], and maintained eye contact." (*Id.*)  Her affect was primarily "euthymic," she "smiled easily and frequently," and "was calm throughout" the interview.  (*Id.*)  Her "[t]hought processes were goal directed and logical, without loosening of associations or flight of ideas." (*Id.*)  Her thoughts were "[c]ohesive, coherent, and organized." (*Id.*)  She denied having any suicidal or homicidal ideations or hallucinations.  (*Id.*)  "She was oriented to person, place, and time," but

misstated the date of the interview.  (*Id.*)  Her immediate memory, concentration, and abstract

thinking were limited; her remote memory was "intact"; and her judgment and insight were within

normal limits.  (*Id.*)

Plaintiff told Dr. Kraynick that she could "bath[e], groom, cook, and clean on her own," but

"ha[d] to do all of these activities very slowly and pacing herself due to her physical restriction."

(R. at 425.)  Although she could handle her own finances, she "ha[d] some problems remembering

to do them."  (*Id.*)  She drove, went "to church once a year," "rarely socialize[d] with friends," and

was "uncomfortable in crowds."  (*Id.*)  Dr. Kraynick observed that she related well to her and her

staff.  (*Id.*)  She claimed to "seldom have problems with office or authority figures."  (*Id.*)  She

"spen[t] her time watching TV, cleaning, and making lists for everything because she forg[ot]

otherwise."  (*Id.*)  She had no hobbies and "spen[t] a bulk of her time caring for her in-laws and

spending time with family."  (*Id.*)  Her concentration was "variable for reading," she "complete[d]

projects around the house with difficulty given her physical limitations," and there were some things

that "she [could not] do at all."  (*Id.*)  Dr. Kraynick diagnosed her with depression, not otherwise

specified (n.o.s.), lupus, and Sjögren's disease.  (*Id.*)  She noted her occupational and economic

problems, and assigned her a Global Assessment of Functioning (GAF) score of 60.[3]  (*Id.*)  Dr.

Kraynick's prognosis was "guarded" because despite Plaintiff's positive response to "psychiatric

treatment," "her progress was very dependent on her physical health, which appear[ed] to be

declining."  (*Id.*)  Dr. Kraynick opined that Plaintiff could not "manage benefit payments

independently" but that she understood "the meaning of filing for benefits."  (*Id.*)

---

[3]    GAF is a standardized measure of psychological, social, and occupational functioning used in assessing
a patient's mental health.  *Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001).  A GAF score of 51 to 60 indicates
moderate symptoms or "moderate difficulty in social, occupational, or school functioning."  *See* Am. Psychiatric
Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 34 (4th ed., text rev. 2000).

On July 12, 2006, Ingrid Zasterova, M.D., an examining consultant for disability determination services, conducted an "internal medicine examination." (R. at 427–29.) Plaintiff's chief complaints were lupus, carpal tunnel syndrome, and arthritis. (R. at 427.) "She had aches and pains in her back, neck, and lower legs for one year." (*Id.*) She told Dr. Zasterova that she was diagnosed with lupus in December 2005. (*Id.*) Although she "was doing better" with her medication, she stopped taking it the month before because "she could not afford [it] or [her] visits to the rheumatologist." (*Id.*) "Since stopping her medication[s], her symptoms … [had] returned." (*Id.*) While "[s]he ha[d] difficulty doing her housework," she "still [did] some cooking." (*Id.*) She could walk "maybe 1 mile." (*Id.*) She was diagnosed with carpal tunnel syndrome in her right hand but "was not recommended to have an operation." (*Id.*) "She suddenly drop[ped] things out of her right hand, and she ha[d] pain and burning in her hand after she work[ed] in the kitchen or drie[d] her hair." (*Id.*) Her "condition [was] not progressing but [was] stable," and she was otherwise "in good health." (*Id.*)

Upon examination, Dr. Zasterova noted that Plaintiff could hear "well," spoke fluently, and appeared to be in no "acute distress." (R. at 428.) Her back had normal curvature, there was "no palpatory tenderness," and her range of motion was almost complete. (*Id.*) Her extremities showed "2+ pulses" and were "symmetric throughout." (R. at 429.) "There [was] no clubbing, cyanosis, or edema," she had "free range of motion of all joints," and her muscle strength was "5/5 in all four extremities." (*Id.*) Her grip was "5/5 in both hands," "Tinel's sign [was] negative bilaterally," she could "make a fist and extend her fingers," and "Finkelstein's test and Phalen's sign [were] negative." (*Id.*) Her skin was also "intact." (*Id.*)

-8-

From a neurological standpoint, Plaintiff could get "easily on and off the examining table," had "normal station and gait," could "walk on [her] toes, heels, and [in] tandem," could "squat completely and raise herself up holding onto the examining table," and "move[d] around the room without assistive devices." (*Id.*) Her "[f]ine and dexterous finger control seem[ed] to be good," there was "no atrophy," "[s]traight leg raising [was] negative supine and seated bilaterally," and her deep tendon reflexes were "3+, brisk, and symmetric." (*Id.*) "There [were] no sensory deficits," and her finger-to-nose movement was intact. (*Id.*) "Romberg [was] negative." (*Id.*)

Dr. Zasterova diagnosed Plaintiff with "polyarthritic pain" and a history of lupus. (*Id.*) She noted Plaintiff's history of carpal tunnel syndrome but did not find evidence of carpal tunnel syndrome in her examination. (*Id.*) Based on Plaintiff's medical records and her physical examination, Dr. Zasterova opined that Plaintiff could sit more than two hours, stand five to twenty minutes, walk one mile, lift 5 to 30 pounds, and perform fine finger control. (*Id.*)

On July 25, 2006, Leela Reddy, M.D., a non-examining state agency medical and psychological consultant (SAMC), completed a psychiatric review technique form (PRTF) and a mental Residual Functional Capacity (RFC) assessment. (R. at 430–55.) In her PRTF, Dr. Reddy compared Plaintiff's mental impairment to listing 12.04 for "affective disorders" and diagnosed her with "major depression." (R. at 430, 433.) She opined that Plaintiff's depression caused her moderate limitations in her activities of daily living, social functioning, and in maintaining concentration, persistence, and pace. (R. at 440.) She found that Plaintiff had experienced no episodes of decompensation of extended duration. (*Id.*) She noted Dr. Kraynick's June 2006 consultative observations that Plaintiff's social functioning, memory, and concentration were limited, and she was able to bathe, groom, cook and clean independently. (R. at 442.)

In her mental RFC assessment, Dr. Reddy opined that Plaintiff was moderately limited in 8 mental work-related functions, including her ability to understand, remember, and carry out detailed instructions; maintain concentration and attention for extended periods; perform activities within a schedule; maintain regular attendance and be punctual; and work in coordination or proximity to others without being distracted by them.  (R. at 444–45.)  She opined that Plaintiff had mild limitations in 12 functions, including her ability to understand, remember, and carry out very short and simple instructions, sustain an ordinary routine without special supervision, and make simple work-related decisions.  (*See id.*)  Dr. Reddy determined that Plaintiff could "understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in [a] routine work setting."  (R. at 446.)  She concluded that her alleged "limitations from [her] symptoms were not fully supported by the objective [evidence of record]."  (*Id.*)

John Durfor, M.D., a non-examining SAMC, reviewed Plaintiff's treatment records and completed a physical RFC assessment on July 26, 2006.  (R. at 448–55.)  He determined that Plaintiff had the following physical RFC: lift and carry 50 pounds occasionally and 25 pounds frequently; stand, walk, and sit for six hours of an eight-hour workday; push and pull an unlimited amount of weight; and no postural, manipulative, visual, communicative, or environmental limitations.  (R. at 449–52.)  He noted that while Plaintiff reported to Dr. Zasterova a history of carpal tunnel syndrome and polyarthritic pain, Dr. Zasterova's examination revealed "no evidence of carpal tunnel" syndrome.  (R. at 450.)

According to treatment records from Dr. Benjamin and Dr. Inaganti, Plaintiff continued to experience low back pain, knee pain, joint pain, and tender points throughout 2008.  (*See, e.g.*, R.

at  463, 464, 469, 471, 480, 484.)  X-rays of her lumbar spine taken in August 2008 revealed "no compression of any vertebra," but did show "mild degenerative disc disease at [the] L5-S1 level." (R. at 458.)  Additionally, "[t]here [was] no degenerative facet arthropathy at any level" and the "vertebral alignment [was] normal."  (*Id.*)  The final impression was "no compression fracture" and "mild degenerative disc disease at L5-S1."  (*Id.*)  By December 12, 2008, Plaintiff still complained of "ongoing pain in [her right] knee."  (R. at 463.)  Dr. Benjamin diagnosed her with arthritis in her right knee and administered a steroid injection to relieve her pain. (R. at 462–63.)  A month later, Plaintiff rated her pain at 10 on a 10-point scale, and Dr. Inaganti found a positive ANA test and continued arthralgias.  (R. at 478.)

On February 19, 2009, Harold Nachimson, a consultative examiner for disability determination services, performed a physical examination.  (R. at 486–88.)  Plaintiff's chief complaint was "pain in her ankles, knees, and legs, with the right [being] worse than the left."  (R. at 485.)  Her pain had "been going on for two years" and "[was] getting worse."  (*Id.*)  Dr. Nachimson noted her diagnoses of restless leg syndrome, arthritis, lupus, fibromyalgia, and Sjögren's disease.  (*Id.*)  He also noted her complaints of "sun sensitivity with facial rash."  (*Id.*) He found that her "self-care [was] unrestricted," but she sometimes needed help "getting in and out of the tub."  (R. at 486.)  She could "walk some in the backyard," shop pushing a cart, cook with her husband, and perform very light housework—although some chores took her "two weeks" to complete.  (*Id.*)

Plaintiff told Dr. Nachimson that she sometimes needed to use a walker or a knee brace, and she used prescription Voltaren gel to relieve pain in her knee.  (*Id.*)  She "[got] a lot of what she describe[d] was a flu-like feeling all the time with muscular pain."  (*Id.*)  She measured 62 inches

and weighed 169 pounds. (R. at 487.) "Her gait was normal"; she "had some discomfort on extreme flexion"; her right and left lateral flexion was about 15 to 20 degrees; and she could stand on her heels and tiptoes "without difficulty." (*Id.*) Her "upper extremities had no decreased range of motion, including [her] elbows, wrists, and hands." (*Id.*) Her hand grip was normal; her muscle tone was generally 5/5; she had "no evidence of muscle mass tenderness with palpation"; she could bend her fingers without difficulty; her "knees had full extension and flexion"; she "had mild discomfort with internal and external rotation, particularly on the right"; there was "no edema"; her limb length was normal; there "were no signs of atrophy"; her pulses "were present distally"; and there "was no tenderness with palpation in [her] lower extremities." (*Id.*)

Dr. Nachimson's clinical impressions were arthritis with presumed lupus, fibromyalgia, and Sjögren's syndrome; restless leg syndrome; occasional bronchitis; and obesity, with a body mass index (BMI) of 32. (R. at 488.) He also acknowledged Plaintiff's allegation that she "had a pre-diabetic state." (*Id.*) He found that X-rays of her back taken that day revealed "minimal" bone spurring in her lumbar spine. (R. at 489.) "The alignment [was] satisfactory," her "[v]ertebral heights and disc space heights [were] maintained," and there was "no lytic bony lesion." (*Id.*) "No acute radiographic abnormalities [were] demonstrated." (*Id.*)

Jeanine Kwun, M.D., a non-examining SAMC, reviewed Plaintiff's treatment records and completed a physical RFC assessment in March 2009. (R. at 491–98.) Dr. Kwun opined that Plaintiff had the following physical RFC: lift and carry 20 pounds occasionally and 10 frequently; stand, walk, and sit for six hours in an eight-hour workday; push and pull an unlimited amount of weight; occasionally climb ramps, stairs, ladders, ropes, and scaffolds; occasionally balance, stoop, kneel, and crouch; frequently crawl; and no manipulative, visual, communicative, or environmental

limitations. (R. at 492–95.) She noted Plaintiff's allegations of lupus, Sjögren's disease, arthritis, and carpal tunnel syndrome. (R. at 492.) She referenced Dr. Nachimson's notations that Plaintiff drove and shopped; had a normal gait; had a full range of motion; was "able to heel to toe"; had muscle strength of 5/5; and had restless leg syndrome. (*Id.*) Dr. Kwun concluded that Plaintiff's "alleged limitations caused by [her] symptoms [were] not fully supported by the medical and other evidence." (R. at 496.)

Treatment records from Dr. Benjamin and Dr. Inaganti reveal continued diagnoses of fibromyalgia, positive ANA, fatigue, insomnia, anxiety, muscle aches, and pains in 2009 and 2010. (*See, e.g.*, R. at 500, 507–10, 528– 33, 537, 551–54.)

On April 20, 2010, George R. Mount, Ph.D., a consultative psychologist retained by counsel, interviewed Plaintiff, administered psychological testing, and completed a mental examination. (R. at 513–26.) Plaintiff reported medical ailments of "arthritis and chronic pain," which she rated at 10 on a 10-point scale. (R. at 513.) She told Dr. Mount that she "ha[d] been depressed 'most of [her] life' but it ha[d] been worse in the past few years." (*Id.*) "Her physician sent her to see a psychiatrist several years ago for depression." (*Id.*) "She ha[d] a low energy level and [felt] guilty, worthless, and like she [was] being punished." (*Id.*) "She [felt] restless and ha[d] problems with concentration and sleep," felt "helpless and irritable," her "mind [went] blank at times, and she ha[d] muscle tension." (*Id.*)

Dr. Mount assigned Plaintiff a GAF score of 43, indicating a serious impairment in social or occupational functioning. (*Id.*) He explained that the "Millon Clinical Multiaxal Inventory-III" (MCMI-III) "reports [were] normally used on patients who were in the early phases of assessment or psychotherapy for emotional discomfort or social difficulties." (R. at 515.) Accordingly, this

"report [could] not be considered definitive" and "should be evaluated in conjunction with additional clinical data." (*Id.*)

Plaintiff's performance on the MCMI-III indicated "possible diagnoses" of "schizoid personality disorder, depressive personality disorder, and dependent personality traits." (R. at 515.) Her responses also "suggested" the syndromes of "major depression disorder, recurrent, severe, without psychotic features; somatization disorder, prominent [with] hypochondriacal features; and adjustment disorder with anxiety." (*Id.*) Dr. Mount opined that Plaintiff's "response style may indicate a broad tendency to magnify [her] level of experienced illness or a characterological inclination to complain or to be self-pitying." (R. at 517.) Her responses could also reflect "feelings of extreme vulnerability associated with a current episode of acute turmoil," and her "scale scores may [therefore] be somewhat exaggerated." (*Id.*)

Dr. Mount also completed a medical assessment of ability to perform work-related mental activities. (R. at 523–26.) He opined that Plaintiff had a "poor," or "almost absent," ability to function in several mental work-related functions, including her ability to relate to coworkers and the public; interact with supervisors; deal with work stress; function independently; maintain attention and concentration; understand, remember, and carry out complex instructions; understand, remember, and carry out simple instructions; behave in an emotionally stable manner; and act reliably in social situations. (R. at 523–24.)

### 3.    Hearing Testimony

On May 19, 2010, Plaintiff, Dr. Charles Murphy— a medical expert, and a vocational expert testified at the hearing before the ALJ. (R. at 47–63.) Plaintiff was represented by an attorney. (R. at 47, 50.)

### a.     *Plaintiff's Testimony*

Plaintiff testified that she was 44 years old, she measured 64 inches and weighed 160 pounds. (R. at 48.)  She was married, had one adult child, and was a high school graduate.  (R. at 49.)

Plaintiff had always worked in retail, first as a cashier and later as an assistant store manager. (*Id.*)  At different times, she held positions at Macy's, Yankee Candles, Jack-In-The-Box, and a mall kiosk.   (R. at 50.)    She last worked at Dress Barn,  where she was an assistant manager for approximately a year. (R. at 48–49.)  She was discharged from Dress Barn because of her frequent absences due to her illness.  (R. at 55–56.)  She "was sick too much and . . . couldn't do [her] job very well." (R. at 56.)  In 2007, she had six different jobs.  (*Id.*)  She had trouble staying at one job, had poor self-esteem, and "a lot of times [she] didn't think that [she could] do the job or [she] didn't think [she] was smart enough . . . ." (*Id.*)

Plaintiff suffered from several medical conditions for which she took medication.  (R. at 50.) She had low back and leg pain, lupus, fibromyalgia, scoliosis, carpal tunnel syndrome, depression, anxiety, and insomnia.  (R. at 50–51, 54–55.)  In the past, she took Neurontin and Lyrica for her fibromyalgia and lupus, but she stopped taking Lyrica because it caused her to gain weight and eventually stopped working. (R. at 53.)  She was currently taking Lexapro.  (*Id.*)  She took various anti-depressants over the years, including Paxil and Wellbutrin, and was currently taking Prozac. (R. at 52–54).

Plaintiff had low back and leg pain nearly every day, and she spent most of the day in bed. (R. at 50–51.)  She also experienced swelling in her knee and ankle about once a week.  (R. at 52–53.)  She elevated her feet and tried to stay off her feet "as much as [she] [could]."  (R. at 53.) She slept only two to three hours per night because the pain kept her awake.  (R. at 50–51.)

Plaintiff's depression made her sad; she had daily crying spells and stayed in bed much of the time. (R. at 51, 54.) She only got up to talk to her son occasionally. (R. at 54.) She lacked "the will to do anything," and had problems with her memory and concentration. (*Id.*) She was often angry and irritable. (R. at 55.) She had never been hospitalized for depression, and her primary care doctor never referred her to a psychologist or psychiatrist, "[s]he just recommended a specialist for [her] other problems." (R. at 52.)

Plaintiff's carpal tunnel syndrome caused numbness in her right hand and fingers, running up into her right arm at times, and she often dropped things as a result. (R. at 55.) She received a steroid injection and sometimes wore a wrist splint. (R. at 51.) Although her doctor had not yet recommended surgery, she was told she might need it in the future. (R. at 52.)

Plaintiff could do housework, but only for a few minutes at a time. (R. at 56.) It sometimes took her a week to vacuum a few rooms. (*Id.*) Her husband cooked when he was not working; otherwise, Plaintiff cooked or ordered take-out. (*Id.*) She did not believe she could run a household without her family's help, as she often forgot to pay the bills or rent. (R. at 57.) She only drove about two or three times a week. (R. at 49.) She did not have any friends. (*Id.*)

Plaintiff did not have a criminal record and she did not use illegal drugs. (R. at 56.)

### b.    *Medical Expert's Testimony*

Dr. Murphy, a medical expert (ME), summarized Plaintiff's medical records. (R. at 57–59.) Based on the records, the ME opined that Plaintiff's physical "medically determinable impairments" were minimal lumbar spondylosis with small anterior spurs at the L3-L4 level, scoliosis, degenerative disc disease at L5-S1, mild obesity, chronic pain syndrome, and fibromyalgia. (*Id.*) He testified that there were no electric diagnostic studies that confirmed carpal tunnel syndrome, and

-16-

her first consultative physical exam was negative for carpal tunnel. (*See id.*) He also testified that there was no "hard evidence" of connective tissue disease. (R. at 59.) The ME opined that none of Plaintiff's impairments, considered individually and in combination, met or medically equaled a listed impairment. (*Id.*) Considering Plaintiff's physical impairments, he opined that she could work "at the light level of exertion." (*Id.*)

        *c.*    ***Vocational Expert's Testimony***

A vocational expert (VE), also testified at the hearing. (R. at 47, 60–62.) She testified that Plaintiff's past relevant work included her jobs as an assistant store manager (light, skilled, SVP-7); a general merchandise sales person (light, semi-unskilled, SVP-3); and a fast food worker (light, unskilled, SVP-2) (R. at 60.)

The ALJ asked the VE to opine whether a hypothetical person with Plaintiff's capacity to work at a "light level" of exertion could perform her past relevant work with the following limitations: lift 20 pounds occasionally or 10 pounds frequently; stand or walk for 6 of 8 hours in an 8 hour workday; sit for 6 of 8 hours in an 8 hour workday; understand, remember, and carry out short, simple tasks and instructions; occasional public contact; and occasional interaction with coworkers or supervisors. (*Id.*) The VE opined that the hypothetical person could not perform Plaintiff's past relevant work. (*Id.*)

The ALJ then asked the VE to opine whether there were jobs existing in significant numbers in the national economy that a hypothetical person with Plaintiff's age, education, work experience, and RFC could perform. (R. at 61.) The VE opined that the hypothetical person could perform the jobs of small product assembler (light, unskilled, SVP-2), with 50,000 jobs in the national economy;

bench assembler (light, unskilled, SVP-2), with 32,000 jobs in the national economy; and plumbing hardware assembler (light, unskilled, SVP-2), with 30,000 jobs in the national economy.  (*Id*.)

The ALJ then asked the VE whether an added limitation of standing and stretching every 30 minutes to an hour would impact any of the jobs she identified.  (*Id*.)  The VE opined that such a limitation would not have any impact.  (*Id*.)  The ALJ also asked the VE whether a person who was not able to complete a normal workday or workweek due to psychological symptoms or behavioral extremes would be "competitive in the national economy."  (*Id*.)  The VE opined that such a person would not be competitive.  (*Id*.)  In response to a question by the ALJ, the VE stated that her testimony did not conflict with the Dictionary of Occupational Titles (DOT).  (R. at 61–62.)

Counsel then asked the VE whether the jobs she identified required constant use of the hands.  (R. at 62.)  She testified that all three jobs required "frequent" fingering.  (*Id*.)  Counsel also asked the VE whether a hypothetical person with the RFC identified by the ALJ, but who could not maintain regular attendance 20 percent of the time and could not be punctual within customary tolerances, would be able to maintain competitive employment.  (*Id*.)  The VE opined that the hypothetical person could not sustain competitive employment.  (*Id*.)  Counsel then asked the VE whether a hypothetical person with the same RFC as stated by the ALJ, but who also had problems completing a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace, would be able to maintain competitive employment.  (*Id.*) The VE opined that the hypothetical person would be precluded from competitive employment.  (*Id*.)

C.      **ALJ's Findings**

The ALJ denied Plaintiff's application for benefits by written opinion issued on August 25, 2010.  (R. at 24–29.)  At step one, the ALJ found that Plaintiff was fully insured for disability through December 31, 2013, and had not engaged in substantial gainful activity since December 26, 2008.  (R. at 26.)  At step two, the ALJ found that Plaintiff had the following severe impairments: chronic pain syndrome, lumbar back pain with small spurs, trivial scoliosis, mild degenerative disc disease, minimal lumbar spondylosis at L5-S1, mild obesity, fibromyalgia, and depression.  (R. at 27.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 31.)

The ALJ determined that Plaintiff had the RFC to perform work at the light exertional level with the following limitations: lift up to 20 pounds occasionally and lift or carry up to 10 pounds frequently; walk; sit, and stand for 6 hours in an 8 hour workday; stand and stretch at 30 to 60 minute intervals; understand, remember, and carry out short and simple instructions; interact with the public only occasionally; and occasional coworker interaction and supervision.  (R. at 33).

At step four, based on the VE's testimony, the ALJ found that Plaintiff could not perform her past relevant work.  (R. at 37.)  At step five, she determined that Plaintiff could perform other jobs in the national economy, such as small products assembler, with 50,000 jobs in the national economy; bench assembler, with 32,000 jobs in the national economy; and plumbing-hardware assembler, with 30,000 jobs in the national economy.  (R. at 38–39.)  Accordingly, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act between her alleged onset date of December 26, 2008 and the date of the ALJ's decision.  (R. at 39.)

## II.  ANALYSIS

A.    <u>Legal Standards</u>

1.    **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3).  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *See id*.  The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision.  *See id*.

### 2.      Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act.  *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

> 1.      An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.
>
> 2.      An individual who does not have a "severe impairment" will not be found to be disabled.
>
> 3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.
>
> 4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.
>
> 5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)).  Under the first four steps of the analysis, the burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The

analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.**     **Issues for Review**

Plaintiff presents the following issues for review:

(1)     Unless the correct severity standard is used by the ALJ in the disability evaluation, the claim must be remanded to the Commissioner for reconsideration. The ALJ cited to the appropriate precedent, but he also stated an incorrect standard numerous times in the written decision. Did the ALJ's ambiguity regarding the standard applied create legal error requiring remand?

(2)     When medical findings do not substantiate the existence of physical impairments capable of producing alleged pain and other symptoms, the ALJ must investigate the possibility that a mental impairment is the basis of the symptoms. The ALJ considered Gibbons's physical and mental impairments separately and did not give any indication that he considered whether Gibbons's somatoform, chronic pain, and other mental impairments contributed to the allegations he found not credible. Were the ALJ's credibility and RFC findings supported by substantial evidence when he failed to fully consider the impact of Gibbons's mental impairments?

(Pl. Br. at 1–2.)

**C.**     ***Stone* (De Minimis) Standard**

Plaintiff argues that remand is required because, despite citing to *Stone*, the ALJ "created ambiguity as to the severity standard [he] used at step two." (Pl. Br. at 9.)  She argues, in essence, that if the ALJ had used the *Stone* severity standard, he would have recognized as severe, additional physical and mental impairments that "affected [her] ability to work." (*Id.* at 12.)

Pursuant to the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c) (2012).  Finding that a literal application of this regulation would be inconsistent with the Social Security Act, the Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Stone v. Heckler*, 752 F.2d 1099, 1101, 1104-05 (5th Cir. 1985).  Additionally, the determination of severity may not be "made without regard to the individual's ability to perform substantial gainful activity." *Id*. at 1104.

To ensure that the regulatory standard for severity does not limit a claimant's rights, the Fifth Circuit held in *Stone* that it would assume that the "ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect, or by an express statement that the construction we give to 20 C.F.R. § 404.1520(c) [(2012)] is used." *Id*. at 1106; *See Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).  Notwithstanding this presumption, courts must look beyond the use of "magic words" and determine whether the ALJ applied the correct severity standard. *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986).

Here, in reciting the applicable law, the ALJ stated that "[a]n impairment or combination of impairments is 'severe' within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities." (R. at 25) (citing to 20 C.F.R. § 404.1520(c)). After listing Plaintiff's impairments that he found were severe, the ALJ stated that a "medically determinable impairment is 'severe' if it is more than a slight abnormality and imposes more than a minimal limitation on [the claimant's] physical or mental ability to engage in basic work activities." (R. at 27) (citing Social Security Ruling (SSR) 85-28, 1985 WL 56856, at *3 (S.S.A. 1985)). The ALJ then cited to *Stone*. (*See id.*)

Unlike the ALJ's first and second articulations, *Stone* provides no allowance for a *minimal*, and much less a *significant*, interference with a claimant's ability to work. The difference between these two constructions and *Stone*, coupled with the ALJ's failure to specify which standard he actually applied in his disability evaluation, compel the conclusion that he applied an incorrect standard of severity. *See Garcia v. Astrue*, No. 3:08-CV-1881-BD, 2010 WL 304241, at *3 (N.D. Tex. Jan. 26, 2010) (explaining that courts in this district have consistently rejected, as inconsistent with *Stone*, the definition of severity under 20 C.F.R. § 404.1520(c) that the ALJ cited in this case); *see also Lawson v. Astrue*, No. 4:11-CV-00426, 2013 WL 449298, at *4 (E.D. Tex. Feb. 6, 2013) ("while the difference between the two statements appears slight, it is clear that the [regulatory definition] is not an express statement of the *Stone* standard"); *Neal v. Comm. of Social Sec. Admin.*, No. 3:09-CV-0522-N, 2009 WL 3856662 at * 1 (N.D. Tex. Nov.16, 2009) ("Even though citation to *Stone* may be an indication that the ALJ applied the correct standard of severity, nowhere does *Stone* state that the ALJ's citation to *Stone,* without more, conclusively demonstrates that he applied the correct standard.").

Nevertheless, as recently held by the Fifth Circuit and courts within this district, *Stone* error does not mandate automatic reversal and remand, and application of harmless error analysis is appropriate in cases where the ALJ proceeds past step two in the sequential evaluation process.  *See Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012) (per curiam) (applying harmless error analysis where the ALJ failed to cite *Stone* at step two but proceeded to steps four and five of the sequential evaluation process); *Goodman v. Comm'r of Soc. Sec. Admin.*, No. 3:11-CV-1321-G BH, 2012 WL 4473136, at *9 (N.D. Tex. Sept. 10, 2012), *recommendation adopted*, 2012 WL 4479253 (N.D. Tex. Sept. 28, 2012); *Jones v. Astrue*, 821 F. Supp. 2d 842, 851 (N.D. Tex. 2011) (to same effect).  In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error.  *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

Here, the ALJ found at step two that Plaintiff had eight severe impairments: (1) chronic pain syndrome; (2) back pain (lumbar) with small spurs; (3) trivial scoliosis; (4) mild degenerative disc disease; (5) minimal lumbar spondylosis at L5-S1 ; (6) mild obesity; (7) fibromyalgia with 14 of 18 tender points in September 2009; and (8) depression.  (R. at 27.)  Because none of Plaintiff's impairments or combination of impairments met or medically equaled a listed impairment at step three, the ALJ proceeded to assess Plaintiff's RFC.  (*See* R. at 33); *see also* 20 C.F.R. § 404.1520a(d)(3); *Boyd*, 239 F.3d at 705 ("If the [claimant's] impairment is severe, but does not reach the level of a listed disorder, then the ALJ must conduct a [RFC] assessment.")  The ALJ determined that Plaintiff had the following RFC: lift 20 pounds occasionally; lift and carry up to 10 pounds frequently; walk, sit, and stand for six hours of an eight-hour workday; be permitted to stand and stretch at 30 and 60 minute intervals; understand, remember, and carry out short and simple

instructions; no more than occasional contact with the public; and occasional interaction with coworkers and supervision.  (R. at 33.)

In assessing Plaintiff's RFC, the ALJ explained that he reviewed and considered all of the evidence, including opinion evidence, and "all [of Plaintiff's] symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence." (*Id.*)  Consideration of all "medically determinable impairments ... including [those] that are not 'severe,'" and "all of the relevant medical and other evidence," is required by the regulations when determining a claimant's RFC.  *See* 20 C.F.R. § 404.1545(a)(2)-(3) (2012); SSR 85-28, 1985 WL 56856, at *3.

### 1.    *Plaintiff's Mental Impairments*

Plaintiff argues that the *Stone* error was not harmless and requires remand because the ALJ did not find her mental impairments, i.e., personality disorder, severe anxiety, fatigue, insomnia, and somatization disorder, to be severe at step two, and did not consider their effects on her ability to work at step five, even though her psychological evidence showed that they affected her ability to work. (Pl. Br. at 12.)

At step two, the ALJ essentially determined that Plaintiff's depression was her only severe mental impairment.  (*See* R. at 27.)  After reviewing the evidence of record, including Plaintiff's treatment notes and opinion evidence, the ALJ determined that she retained the mental RFC to understand, remember, and carry out short and simple instructions, and was limited to occasional contact with the public, coworkers, and supervision. (*See* R. at 33.)

In reaching this finding, the ALJ  acknowledged Plaintiff's testimony in response to his question about how her "depression or anxiety" affected her, that she slept only "two to three hours

-26-

a night and stay[ed] in bed most of the day," her "depression ke[pt] her from doing things," and she cried "a lot." (R. at 34, 50–51.) Plaintiff also testified that her medications were helpful, and that her primary care physician (Dr. Benjamin) did not refer her to a psychologist or psychiatrist, but only recommended a specialist for her "other problems." (R. at 52.)

Elsewhere in his discussion, the ALJ noted Plaintiff's statements to Dr. Mount, a consultative psychologist retained by counsel, "that she felt restless and helpless, had problems with concentration and sleep and had had problems with depression most of her life." (R. at 32, 513.) While the ALJ did not specifically mention Dr. Mount's "possible diagnoses" of personality and somatization disorders, he did acknowledge his "possible diagnoses" of severe depression and severe anxiety. (R. at 36, 513, 515.) The ALJ only "partially accepted" Dr. Mount's diagnoses, explaining that his assessment appeared to be based "largely on [Plaintiff's] self-reporting of her symptoms and on [the] MCMI and Beck" computer-generated reports. (*See id.*)

The ALJ gave great weight to Dr. Kraynick's diagnosis of depression and found significant her observations that Plaintiff "related well to her and her office staff and stated that she seldom had problems with office or authority figures." (R. at 36, 425.) He adopted the conclusion of Dr. Reddy, a non-examining SAMC, that despite Plaintiff's depression, "her statements about the limiting effect of [her] impairments [were] only partially credible," as well as her mental RFC assessment that she "retain[ed] the mental capacity to sustain a routine of simple work activity." (R. at 36, 446.)

Although the ALJ did not explicitly find that Plaintiff's alleged personality disorder, anxiety, fatigue, insomnia, and somatization disorder were severe impairments at step two, in his mental RFC assessment, he expressly considered the effects of her "medically determinable depression," along with all of her non-exertional symptoms and limitations that he found were supported by the record.

(*See* R. at 27–39.)  At steps four and five, the ALJ concluded that accounting for Plaintiff's age, education, work experience, and mental RFC, she could not return to her past relevant work, but could perform other work, and was therefore not disabled.  (R. at 37–39.)

The ALJ's disability decision shows that he considered Plaintiff's alleged anxiety, insomnia, and fatigue.  (*See* R. at 30, 34, 36.)  To the extent that the ALJ rejected her alleged diagnoses of personality and somatization disorders as not being medically determinable impairments, as the trier of fact, he was entitled to reject those diagnoses if he found they were not supported by the objective medical evidence.  *See Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000) ("Conflicts in the evidence are for the [ALJ] ... to resolve.").  At step two, it was still Plaintiff's burden to prove she had an impairment or combination of impairments that rendered her "incapable of engaging in any substantial gainful activity."  *See Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986); *see also Fraga v. Bowen*, 810 F.2d 1296, 1301 (5th Cir. 1987).  A "physical" or "mental" impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C.A. § 423 (d)(3) (West 2004).  Dr. Mount explained that the MCMI-III report could not be considered "definitive" because it was used only "in the early phases" of assessment or psychotherapy and "should be evaluated in conjunction with additional clinical data."  (*See* R. at 515.)  He also opined that Plaintiff's response style indicated a "broad tendency to magnify" her perceived symptoms and her scale scores could therefore be "somewhat exaggerated."  (*See id.*)

In conclusion, the ALJ's *Stone* error was harmless with respect to Plaintiff's mental impairments because it is inconceivable that he would have assessed a different mental RFC—and thereby reached a different disability determination at step five—if he had applied the *Stone* severity

standard at step two.  *See Taylor*, 706 F.3d at 603 (finding that the ALJ's failure to cite to *Stone* at step two was harmless, and "remand [was] not required since there [was] no evidence in the record that [the claimant's] mental health claims [were] severe enough to prevent him from holding substantial gainful employment" at step five); *Goodman*, 2012 WL 4473136, at *10 (*Stone* error was harmless where the ALJ considered the effects of the claimant's mental impairments, including those that were not severe, on his ability to work at step four).  Remand is therefore not required on this ground.

### 2.    *Plaintiff's Physical Impairments*

Plaintiff also argues that the ALJ's *Stone* error was not harmless and requires remand because he failed to find that her "repeatedly diagnosed" physical impairments of arthritis, arthralgia, and polyarthralgias were severe impairments at step two and affected her ability to work at step five.  (Pl. Br. at 12.)

At step two, the ALJ adopted Dr. Murphy's "expert opinion" that Plaintiff's "medically determinable [physical] impairments" were her chronic pain syndrome, lumbar back pain lumbar with small spurs, trivial scoliosis, mild degenerative disc disease, L5-S1 minimal lumbar spondylosis, mild obesity, and fibromyalgia, and concluded that these were Plaintiff's "severe" physical impairments.  (R. at 27, 30–31, 57–59.)  Because none of these impairments, either alone or in combination, met or medically equaled a listed impairment, the ALJ assessed Plaintiff's physical RFC and determined that she could lift 20 pounds occasionally; lift and carry 10 pounds frequently; and stand, sit, and walk for six hours of an eight-hour workday, but she should be permitted to stand and stretch at 30 to 60 minute intervals.  (R. at 30.)

In determining Plaintiff's physical RFC, the ALJ stated that Plaintiff "appear[ed] to be

sincere and genuine regarding the pain and limitations she state[d] she experienced [from] her medical impairments," but he concluded that her "most serious symptoms and limitations [were] simply outside of the range of reasonable attribution ... [to] the medical opinions of record." (R. at 35.)  He determined that her "medically determinable impairments [could not] reasonably be expected to produce the symptoms to the degree alleged by her."  (R. at 37.)  The ALJ acknowledged her testimony that she had "pain in her back, lower spine, and in her legs," she wore "a wrist-to-elbow splint when her pain was really aggravated," "she [got] swelling around her ankle and knee joints, and … [she] elevate[d] … and [stayed] off her feet" as much as possible.  (R. at 34, 50–53.)  The ALJ also considered "the effects of [Plaintiff's] obesity and included those effects within [his] determination of [her] [RFC]."  (R. at 37.)

The ALJ noted Dr. Durfor's, a non-examining SAMC, findings that Plaintiff had the physical RFC to work at the medium exertional level with no "postural limitations."  (R. at 28, 448–55.)  He also acknowledged the opinion of Dr. Kwun, another non-examining SAMC, that Plaintiff "retained the [physical RFC] for light work activity with postural functions performed no more often than occasionally except for the function of crawling, which could be performed frequently."  (R. at 36, 492–95.)  The ALJ did "not assign significant weight" to Dr. Durfor's or Dr. Kwun's consultative RFC findings, explaining that they "were based on a less developed record, and did not address the connection between [Plaintiff's] symptoms and [her] medically determinable impairments." (*Id.*)  He found Dr. Kwun's "postural restrictions [were] not consistent with [Plaintiff's] functional abilities" as indicated by the objective medical evidence and assessed by Dr. Murphy.  (R. at 36.)

The ALJ considered the effects of Plaintiff's physical impairments that he found to be severe on her ability to work and adopted Dr. Murphy's "expert opinion" that given those impairments, she

-30-

was capable of performing work at the light exertional level, as defined by 20 C.F.R. § 404.1567(b), with "the requirement that she … be permitted to stand and stretch every 30 [to] 60 minutes." (R. at 30, 33, 36, 59.) The ALJ then proceeded to steps four and five and based on the VE's testimony, he concluded that considering Plaintiff's age, education, work experience, and RFC, she could not return to her past relevant work but could perform other work. (R. at 37–38, 60.) Accordingly, the ALJ concluded that Plaintiff was not disabled. (R. at 38–39, 61.)

The ALJ did not discuss, or even mention, Plaintiff's diagnoses of arthritis, arthralgia, and polyarthralgias. (*See* R. at 34–39, 400–01, 416, 427, 463, 478, 485, 488, 492.) Because an arthralgia is an ache or pain in a joint, these last two conditions could reasonably be said to be accounted for in the ALJ's finding that Plaintiff's chronic pain syndrome was a severe impairment. *See Lahaye v. Astrue*, No. CIV.A. 09-566, 2010 WL 3724331, at \*3 (W.D. La. Aug. 26, 2010), *recommendation adopted*, 2010 WL 3724334 (W.D. La. Sept. 16, 2010) (finding that "the ALJ accounted for [the claimant's] narcolepsy in his recognition of sleep apnea as a severe impairment"). Moreover, even if the ALJ committed error in excluding arthralgia and polyarthralgias in his disability analysis, such an error was harmless because the ALJ considered the effects of Plaintiff's chronic pain syndrome on her ability to work, and incorporated them in his RFC assessment by limiting her to light work, with the requirement that she be allowed to stand and stretch at regular intervals. *See id.* (holding that "[e]ven if the ALJ should have recognized narcolepsy as a separate and severe impairment, the … error was harmless, as the ALJ considered the effects of a sleep disorder, whether narcolepsy or sleep apnea, throughout the sequential analysis"); (*see also* R. at 30, 33).

Nevertheless, nothing in the ALJ's narrative discussion could reasonably be said to incorporate any limitations or effects that Plaintiff's arthritis may have had on her ability to work. In August 2005, Dr. Benjamin diagnosed her with arthritis of the joints, her thoracic spine, and her lumbar spine at L5.   (R. at 400.)   In July 2006, Dr. Zasterova, an examining consultant, acknowledged Plaintiff's "chief complaint" of "arthritis" and diagnosed her with "polyarthritic pain." (R. at 427–29.)  By December 2008, Dr. Benjamin diagnosed her with arthritis in her right knee and administered a steroid shot to relieve her symptoms.  (R. at 462–63.)  Two months later, Dr. Nachimson, a consultative examiner, also diagnosed Plaintiff with arthritis.  (R. at 485.)  By March 2009, Dr. Kwun acknowledged these diagnoses in her consultative physical RFC assessment. (R. at 492.)  The ALJ did not address or discuss this evidence.  (*See* R. at 24–38.)

Because the ALJ did not address Plaintiff's arthritis at any step of the disability analysis, it is unclear whether he purposefully dismissed it as non-severe based on his application of an incorrect severity standard at step two.  He did not consider the effects that this impairment may have had on Plaintiff's ability to perform physical work-related functions when assessing her RFC, as he was required to do by the regulations and the corresponding ruling.  *See* 20 C.F.R. § 404.1545(a)(1)-(3); SSR 85-28, 1985 WL 56856, at \*3.  Consequently, he did not consider the effects that Plaintiff's arthritis may have had on her ability to work at step five.  While he added the limitation that Plaintiff be allowed to stand and stretch every 30 to 60 minutes, it is not inconceivable that he would have adopted Dr. Kwun's RFC postural limitations if he had considered Plaintiff's arthritis of the joints and of her right knee.  (*See* R. at 33, 400, 462–63.)  Accordingly, the ALJ's failure to specify which severity standard he used at step two was not harmless as to this physical impairment and requires remand.  *See Hall v. Astrue*, No. 3:11-CV-1929-BH, 2012 WL

4167637, at *13 (N.D. Tex. Sept. 20, 2012) (holding that *Stone* error was not harmless and required remand because the ALJ did not address or consider the effects of one of the claimant's physical impairments on his ability to work at any step of the sequential evaluation process).

Because the ALJ's use of the correct standard on remand will necessarily impact his assessment of Plaintiff's RFC and her ability to work, the Court does not address her second issue.

### III.   CONCLUSION

Plaintiff's motion is **GRANTED in part**, Defendant's motion is **DENIED in part**, and the case is **REMANDED** to the Commissioner for further proceedings.

**SO ORDERED**, on this 30th day of March, 2013.


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE